1
2
3
4
5
6
7 **UNITED STATES DISTRICT COURT**
8 **DISTRICT OF NEVADA**
9

10  MAUREEN "MOLLY" GIBBONS, *et al.*,

11       Plaintiffs,                                    Case No. 2:05-cv-00787-LDG (GWF)

12  v.                                                  <u>ORDER</u>

13  APHRODITE "AMY" DEMORE, *et al*.,

14       Defendants.

15

16       The plaintiffs, Maureen "Molly" Gibbons and Denise Hooshmand, worked for

17  defendant Sunrise Hospital and Medical Center, LLC. (Sunrise), under the supervision of

18  defendant Aphrodite "Amy" Allin.[1]  They assert that Allin uttered racial slurs to them

19  regarding people with whom the plaintiffs had previously associated, and heard (or heard

20  of) racial slurs she uttered about other co-workers and patients.  After complaining of Allin's

21  conduct, they allege they were subjected to retaliation.  The plaintiffs sue for discrimination

22
23
24
25

_____

26       [1]    Subsequent to the filing of the complaint, Amy Demore married and is now
known as Amy Allin, and the court will refer to her as such.

and retaliation under Title VII, and for negligent infliction of emotional distress and negligent supervision, training, and retention pursuant to state law.[2]

The defendants move for summary judgment as to each of the claims.  They argue that, as Gibbons, Hooshmand, and Allin are each Caucasian, the plaintiffs cannot maintain claims for a racially hostile employment environment.  They further contend that, in any event, the plaintiffs have shown only a few stray remarks rather than a hostile environment. The defendants also argue that the plaintiffs have not offered competent evidence supporting their remaining claims.  Having carefully considered the competent evidence offered by the parties, as well as their arguments and pleadings, the court will grant the motions for summary judgment.

Jurisdiction

The court has original jurisdiction pursuant to 28 U.S.C. §1331, as the plaintiffs' complaint alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.; that is, the complaint alleges claims arising under a law of the United States.  The court has supplemental jurisdiction of the plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

Summary Judgment Standard of Review

In considering a motion for summary judgment, the court performs "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To succeed on a motion for summary judgment, the moving party must show (1) the lack of a genuine issue of any material fact, and (2)

---

[2] The plaintiffs also alleged, in their complaint, claims for intentional infliction of emotional distress.  In opposition to the motions for summary judgment, the plaintiffs abandoned those claims.

2

1   that the court may grant judgment as a matter of law.  Fed. R. Civ. Pro. 56(c);  *Celotex*

2   *Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

3         A material fact is one required to prove a basic element of a claim.  *Anderson,* 477

4   U.S. at 248.  The failure to show a fact essential to one element, however, "necessarily

5   renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

6         "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

7   adequate time for discovery and upon motion, against a party who fails to make a showing

8   sufficient to establish the existence of an element essential to that party's case, and on

9   which that party will bear the burden of proof at trial."  *Id.*  "Of course, a party seeking

10  summary judgment always bears the initial responsibility of informing the district court of

11  the basis for its motion, and identifying those portions of 'the pleadings, depositions,

12  answers to interrogatories, and admissions on file, together with the affidavits, if any,' which

13  it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S.

14  at 323.  As such, when the non-moving party bears the initial burden of proving, at trial, the

15  claim or defense that the motion for summary judgment places in issue, the moving party

16  can meet its initial burden on summary judgment "by 'showing'–that is, pointing out to the

17  district court–that there is an absence of evidence to support the nonmoving party's case."

18  *Celotex*, 477 U.S. at 325.

19        Once the moving party meets its initial burden on summary judgment, the non-

20  moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro.

21  56(e).  As summary judgment allows a court "to isolate and dispose of factually

22  unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the

23  evidence before it "in the light most favorable to the opposing party."  *Adickes v. S. H.*

24  *Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however,

25  will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co.*

26  *v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

Factual Background

      The following recitation constitutes the facts for purposes only of this decision.  This background is developed from undisputed facts and, when facts are disputed, by construing the dispute in favor of the plaintiffs as the non-moving party.

      Prior to April 2003, Hooshmand and Gibbons worked as Case Managers in Sunrise's Case Management Department.  Both Hooshmand and Gibbons are Caucasian. Hooshmand had previously been married to a man of Middle Eastern descent.  Gibbons had a child from a prior relationship with an African-American man.

      In October 2002, Hooshmand was appointed Interim Director of Case Management. Hooshmand did not apply to become the Director of Case Management, and informed her supervisor that she did not want the job permanently.  Sunrise interviewed[3] and, in late April 2003, hired Allin, a Caucasian, as Director of Case Management.  Hooshmand continued to work in the Case Management Department as a Specialist Clinical Appeals, a position for which Hooshmand, herself, wrote or helped write the job description.

      Shortly after Allin began working, she "sporadically, but quite frequently"[4] stated to Hooshmand, in some form, that Hooshmand needed to become Denise "black" and stop being Denise "white."[5]  In her first use of this phrase to Hooshmand, Allin indicated that she believed Hooshmand was "too nice," and she was going train Hooshmand to be mean like her.  Hooshmand interpreted Allin's use of the phrase as a training tool, "to turn [her] into a mini [Allin]."  Allin used the phrase whenever Hooshmand was acting in her "usual kind, caring, compassionate way."

---

[3]    Hooshmand conducted one of the interviews, and recommended hiring Allin.

[4]    Hooshmand variously testified that the statements were made "frequently within the first couple of months," and that they were made "throughout the whole five months."

[5]    In her handwritten statement to the EEOC, Hooshmand records Allin's phrases as Denise "black" and Denise "white."

1      Allin also used the phrase in explaining, to Hooshmand, the assignment of an

2  African-American, female employee to work in ER with Hooshmand, stating: "'I need you to

3  train Verna to go down to the ER because she's a black woman and no one is going to

4  argue with a black woman, you need to be Denise black,'" adding that Hooshmand

5  "need[ed] to be this, you know, aggressive, mean-spirited person."

6      Between five and ten times,[6] while Allin was talking with Hooshmand, Allin

7  referenced Hooshmand's ex-husband as "towel head, sand nigger, Arab rat, whatever. . . ."

8  On about four or five occasions, near the end of summer, Hooshmand heard Allin use

9  these terms to refer to a Sunrise employee.

10      On about eight occasions, Hooshmand heard Allin refer to certain Filipino

11  employees as the "pineapple connection," and instructed Hooshmand to "get tight" with the

12  "pineapple connection."

13      On about three to five occasions, Allin referred to an Hispanic patient from Mexico

14  as a "spic."  Gibbons heard Allin use this term on a single occasion in June or July, 2003.

15  She also referred to the patient as "Mr. Mexico."  Hooshmand also heard Allin refer to other

16  patients by national origin, including: "Ms. Argentina," (stated about five times), "Mr.

17  Guatemala," and "Ms. Chile."  Gibbons heard Allin use the term "Ms. Argentina."[7]

18      On one or maybe two occasions in late summer, Allin stated to Hooshmand that

19  "Verna [an African-American] is white."  When Hooshmand asked Allin to explain, Allin

20  replied that Verna was "high skill.  She shops at the best shops, she comes in with good

21

22

23  _____

24      [6]      In her deposition, Hooshmand variously testified that Allin made the
references four or five times, and more than five but fewer than ten times.

25      [7]      While Gibbons testified that Allin also used the terms "Mr. Mexico" and "Miss
26  Guatemala," her deposition testimony is unclear when she personally heard Allin utter
these terms.

1    fashionable shoes and purses and things, and Verna doesn't know she's black, she's

2    white."[8]

3        On one occasion, while Allin was getting her lunch, Allin stated to Gibbons that Allin

4    did not eat white, to which Gibbons responded that she ate a lot of white meat.  Allin

5    replied: "No, you don't.  You only eat dark meat.  Just look at your son."  Gibbons did not

6    hear Allin make any other statement that she interpreted as referring to the race of the

7    father of her son.[9]

8    _____

9        [8]    Gibbons offered evidence that she became aware that, at some point, Verna
    told Allin that she was crazy for a busy day, to which Allin responded, "and your [sic]
10   black too."  The only evidence upon which Gibbons relies as evidence of her awareness,
    her handwritten complaint of September 24, 2003, does not reveal whether Gibbons'
11   awareness resulted from being a percipient witness or from hearing about the exchange
    from a percipient witness.

12       [9]    In her opposition, Gibbons asserts that Allin's secretary, Francine Caivano,
    heard Allin state that Gibbons was a "nigger lover" and a "black lover" at least five or six
13   times.  Gibbons' characterization of Caivano's testimony is troubling.  A review of the
    specific testimony cited by Gibbons in Gibbons' exhibit of Caivano's deposition establishes
14   that Caivano did not use the term "black lover."  Neither does Caivano state that Allin used
    the term "black lover" on any other page of Caivano's deposition testimony submitted by
15   Gibbons.  Thus, the evidence submitted by Gibbons would require the court to find that
    Caivano did not use the term "black lover."
16       Sunrise has established, however, that a month before Gibbons filed her opposition,
    Caivano corrected her deposition testimony, changing nine different answers in which
17   Caivano testified that Allin used the phrase "nigger lover" to the phrase "black lover."  (The
    corrections are, themselves, interesting.  Immediately after Caivano's last set of responses
18   in which she originally testified that Allin used the phrase "nigger lover," she was expressly
    asked "are you sure the expression wasn't black lover?"  Caivano responded, "No.  She
19   didn't use those nice words."  Cavaino was then asked, "Did she ever use the expression
    black lover?"  Cavaino responded, "No, I never heard her use that expression."  Caivano
20   did not alter or correct this testimony.)
        As Caivano clearly testified, at her deposition, that she never heard Allin use the
21   phrase "black lover," Gibbons' assertion that Caivano testified that Allin used the phrase
    "black lover" must have relied on Caivano's correction.  That correction, however,
22   eliminates Caivano's testimony that Allin used the term "nigger lover."  As such, Gibbons'
    characterization that Allin used the phrase "nigger lover" is plainly contrary to and
23   unsupported by the record.
        The court would note that Caivano also testified that she heard Allin use the phrase
24   "[black] lover" on "two occasions, three occasions."  Caivano further testified that Allin used
    the phrase in reference to Gibbons on two occasions, and "the third time was just generally
25   about just people being a [black] lover."
        Finally, the court would note that, while Gibbons asserts that she was aware that
26   Allin used the phrase "black lover," she also testified that she first became aware of this

1   Both Gibbons and Hooshmand were trained, and were aware, how to file a

2 complaint of discrimination prior to Allin's first day of working.  Nevertheless, neither

3 reported Allin's racial comments to any appropriate Sunrise authority until early

4 September.[10]  At that time, Hooshmand informed Sharon Sturm of Human Resources of

5 Allin's "erratic behavior, including [her] racial comments."

6   In response, Sturm instructed Hooshmand to write it down and document it.

7 Hooshmand did not follow the instruction to write it down at that time.  Rather, as

8 Hooshmand testified, on September 24, Allin "was manic and angry and just was spouting

9 off.  And so I had just had it.  I went down to HR and I said, you know, 'I just need help with

10 this.'  And that's when Sharon said, 'You've got to write it up.  Let's make an appointment

11 with [Allin's supervisor].'"  Hooshmand then typed up a two-page document she titled

12 "SERIOUS ISSUES/CONCERNS RE: AMY DEMORE – DIRECTOR of CASE

13 MANAGEMENT."  Within this document, Hooshmand complained of Allin's abusive

14 language, unethical leadership, and punitive attitude.  Regarding racial comments that Allin

15 made, Hooshmand documented the following:

16   Uses racial slurs in referencing certain staff, employees, and patients:
    "Pineapple Connection", "Spics", "pt is like retarded Gary on Howard Stern",
17   "Sand N***er", " "Towel head", "Mullet head", "Mr. Guatemala", "Mr. Mexico",
    "Miss Argentina" and "Miss Chile."[11]

18

19

20

---

21 after she filed her complaint, as Mullins talked with her and the other complaining
22 employees.

23   [10]   Hooshmand variously testified that she first talked to Sturm at the end of
   August or the beginning of September, and that she talked to Sturm about two weeks
24 before September 24.

25   [11]   In deposition, Hooshmand acknowledged that "Mullet head" was not a racial
   slur.  When questioned regarding on how "Patient is like retarded Gary on Howard Stern,"
26 is a racial slur, Hooshmand responded that she "grouped everything in there together that
   she said."

1    On that same date, Gibbons wrote, by hand, a three-page document concerning

2  Allin's conduct.  Gibbons recited Allin's "dark meat" comment, Allin's racial comment to

3  Verna, and generally reported that Allin used "racial slurs" regarding patients.

4    On September 25, Hooshmand and Gibbons took their documents to Allin's

5  supervisor.

6    On September 30, Hooshmand, Gibbons and two other employees met with

7  Sunrise's Ethics and Compliance Officer, Linda Mullins, regarding their complaints against

8  Allin.  During the meeting, they gave Mullins copies of the documents they had created on

9  September 24.  Mullins began her investigation of the complaints.

10    Mullins met with Allin twice during the investigation.[12]  At the first meeting, Allin

11  stated, to Mullins, the identity of the persons she surmised had filed the complaints.[13]

12  Mullins did not confirm Allin's belief, but responded that she would not tell Allin who had

13  brought the complaint.  Mullins noted to herself, however, that Allin had identified the four

14  individuals who had complained.  Allin further stated, during the meeting, that the persons

15  she surmised were complaining should not be working in the department, and that

16  Hooshmand and Gibbons "made her skin crawl."

17    As a result of her investigation, Mullins concluded that Allin made inappropriate

18  racial and ethnic comments.  Mullins and Allin's supervisor met with Allin on the morning of

19  Monday, October 13.  Following the meeting, Allin was directed to go home.  Later that

20  afternoon, she was directed to stay home on October 14, as well.  On October 15, Allin

21  returned to work and received a written reprimand for her use of inappropriate racial and

22  _____

23    [12]    The plaintiffs assert that the first meeting occurred at 8:20 a.m. on October 1, but offer no evidence to support this allegation.

24    [13]    Allin testified only that she surmised who had made the complaints, not, as
25  mischaracterized by Gibbons in her opposition, that "[Allin] admitted that she knew who filed the complaints."  Gibbons' Opposition, at 7:11-12.  To surmise is to infer or guess
26  without sufficiently conclusive evidence.  Allin did not testify that she knew who filed the complaints, and Gibbons' mis-characterization of Allin's testimony is not well-taken.

1  ethnic comments.  Allin was specifically directed that there was to be no retaliatory

2  treatment of any employees, and that this was to be a zero tolerance issue.  Later in the

3  day, Mullins met with the entire Case Management Department to inform them that the

4  investigation was completed, and that appropriate action had been taken.  On the following

5  day, Mullins met individually with Hooshmand, Gibbons, and the two other complaining

6  employees.  During that meeting, three of them stated very clearly that they would like to

7  remain in the department.

8  _____Post-Complaint Events Relevant to Hooshmand_

9  In the first few months after Allin was hired, Hooshmand and Gibbons made the

10  daily floor assignments for case managers.  Generally, they performed this task at the end

11  of the preceding day.  Subsequently, Allin assigned this duty to Fely Dumo and Nancy

12  Keller (both of whom were case managers).  Dumo and Keller created the daily floor

13  assignments each morning, right before shifts were scheduled to begin.  Allin then

14  approved the assignments.

15  On September 8, 2003, Hooshmand was assigned to work as a case manager on

16  the S200, S300, and S400 Units.  On September 15, 16, 18, and 19, she was assigned to

17  work as a case manager on the CICU I and CICU IV Units.  On September 20, she was

18  assigned to work as a case manager on the Cath Lab Recovery, ER, and CICU I Units.  On

19  September 23, 24, 25, and 29, she was assigned to work in ER.  On October 3, she was

20  assigned to work as a case manager on the CICU IV and C300 Units.  On that same date,

21  Allin was assigned to work as a case manager on the S200, S400, and P300 Units.  As

22  acknowledged by Hooshmand, on that date "quite a few" case managers were out.

23  Throughout 2003, a manager at Gentiva Health Services made verbal offers of

24  employment to Hooshmand.  These offers were reiterated in September and October.  On

25  October 22, Hooshmand accepted a written offer to work for Gentiva Health Services.

26  Hooshmand specifically waited until the result of the investigation was announced before

9

1 she made her determination to work for Gentiva.  Despite accepting employment with

2 Gentiva, and announcing her resignation at Sunrise, Hooshmand discussed remaining on

3 staff at Sunrise in the Variable Staffing Pool (VSP).  After Allin became aware that

4 Hooshmand would be working at Gentiva and wished to remain on staff in the VSP, Allin

5 phoned Gentiva.  Hooshmand learned of the phone call, and reported it to Sunrise.  Mullins

6 and Allin's supervisor then phoned Gentiva to determine the nature of Allin's phone call.

7 Gentiva's response indicated that it was confused and surprised by the phone call, but

8 otherwise Allin had not made any negative comment concerning Hooshmand.

9     Allin, Mullins, and others at Sunrise discussed whether Hooshmand would have a

10 conflict of interest working both for Gentiva and in the VSP for Sunrise.  Sunrise

11 subsequently determined that, as no VSP positions were actually open for Hooshmand to

12 fill, she would not be offered a position in VSP.

13     Post-Complaint Events Relevant to Gibbons

14     In early December 2003, Gibbons went to Allin to receive approval for free

15 medication for a patient without insurance.  Allin first instructed Gibbons to cross off certain

16 empty boxes because other patients had filled in the boxes to obtain narcotics.  After this

17 instruction, Allin made statements in the nature of "Give me my medicine, give me my

18 meds, I need my meds," or "[g]ive me the Lortab."  Gibbons interpreted the manner in

19 which Allin made the statement as a "rap" that was racial in nature.  Allin's secretary stated,

20 in her deposition, that Allin was sounding like and imitating a black person.

21     In her opposition, Gibbons cites fourteen incidents she offers in support of her claim

22 of retaliation.  The following sets forth undisputed facts concerning each example.

23     1)    When Gibbons would call Allin, Allin stated to her secretary that she did not

24 want to speak with Gibbons.

25     2)    On October 1, Joyce Schifini and Gibbons were initially assigned to work in

26 pediatrics.  Prior to the shift, the assignment was changed such that Marilyn Alexander and

1   Gibbons would work in pediatrics.  After discovering the change, Gibbons asked Allin to re-

2   assign Schifini to work with her, but Allin denied the request.  Gibbons testified that she

3   wanted to work with Schifini because Schifini could "walk right into it and do the job, yet

4   [Alexander], I would have to spend all day teaching the resources for pediatrics as well as

5   just the simple diagnoses and the vital signs and what pediatrics is all about."  Prior to

6   Alexander's assignment to pediatrics on October 1, Gibbons had spent a couple of days

7   orienting Alexander to pediatrics.

8        The record does not indicate who assigned Alexander to work in pediatrics.  The

9   record does not indicate whether the unknown person that assigned Alexander to

10  pediatrics was aware of Gibbons' complaint.  Allin approved the daily assignments, and

11  denied Gibbons' request to re-assign Schifini back to pediatrics.  While Mullins discussed

12  Gibbons' complaint with Allin early in the investigation, the record lacks any evidence that

13  this meeting occurred prior to either Allin's approval of the daily assignments or Allin's

14  decision to not re-assign Schifini to work in pediatrics.[14]  Other than establishing that

15  Gibbons did not work in pediatrics on October 1, the record does not establish who worked

16  in pediatrics on that date.[15]

17        3)    Both prior to and on October 1, Gibbons received several prank phone calls.

18  On October 2, a message was left on her answering machine, in a disguised, high-pitched

19

20

21

22

23  [14]    While Gibbons specifically asserts that Mullins discussed her complaint with
    Allin at 8:20 a.m. on October 1, she does not offer any citation to any evidence to support
24  this assertion.

25  [15]    Regarding this incident, Gibbons does not complain that her suspension with
    pay, imposed that same day in response to Gibbons' conduct while complaining to Allin of
26  the assignment change, was retaliatory.  Rather, she complains that the act of retaliation
    was the assignment of Alexander, rather than Schifini, to work in pediatrics with her.

1   voice, "You really lost it, honey.  Your credibility ain't worth shit any more."[16]  Gibbons filed

2   a police report.[17]

3        In June 2004, after Allin no longer worked for Sunrise, Gibbons received another

4   prank phone call, in which the caller stated "one of these days, girl."[18]

5        Within a week or so of the present lawsuit being filed, someone broke into Gibbons'

6   home.  Gibbons reports that the only item found missing was her paperwork regarding this

7   lawsuit.

8        4)   Both prior to and after filing her complaint, Gibbons voluntarily took on-call

9   time for financial reasons.  Gibbons was not the only employee to take on-call time.  At a

10  staff meeting on October 9, Allin announced that on-call time would go to Social Workers in

11  the emergency room, in order to save money.  Subsequently, Allin informed Gibbons that

12  Allin and Nancy Keller would be taking on-call time during December to "track and trend."

13  At her deposition, Gibbons testified that she was denied on-call time the first several days

14  of either November or December.[19]

15  _____

16      [16]   Gibbons states her belief, and testified that others stated their belief, that the
    caller sounded like Allin.  The statements of others to Gibbons, which she repeats, are
17  hearsay and incompetent as evidence.  Gibbons testified that she believes the caller
    sounded like Allin.  Gibbons' belief that the caller sounded like Allin permits only
18  speculation whether Allin was, indeed, the caller.

19      [17]   In her opposition, Gibbons asserts that the call was traced to Alexander's cell
    phone, and that Alexander had reported her cell phone to be stolen, and was concerned
20  that her cell phone was used to make the prank calls.  Gibbons does not offer competent
    evidence that the call was traced to Alexander's cell phone, but offers only her own
21  speculation that "the cell phone number evidently was traced back to Marilyn Alexander."
    The statement makes clear that Gibbons did not, herself, trace the number to Alexander's
22  cell phone.  Any knowledge Gibbons had regarding the phone number would have come
    from a hearsay statement to her, and is thus incompetent as evidence of the origin of the
23  phone calls.

24      [18]   Gibbon testified that the caller sounded like Allin's daughter, but offers no
    evidence as to the identity of the caller.

25      [19]   Gibbons did not submit any records indicating the number of on-call days she
26  received prior to her complaint, or the number of on-call days she took in the months after
    the complaint.

1    5)     On October 17, 21, and 28, Gibbons completed Assignment Despite

2    Objection (ADO) Forms, complaining that her workload for each day was unfair.[20]  The

3    daily assignments were made by Fely Dumo and Nancy Keller, and reviewed and approved

4    by Allin.  Mullins investigated Gibbons' complaint, pulling all of Gibbons' assignments for a

5    number of days, creating a spreadsheet to correlate workloads with other case managers,

6    and discussing case manager assignments with Allin's supervisor.  Mullins could not

7    substantiate that the assignments were retaliatory.

8    The assignment sheet for October 17, indicates that seven case managers were

9    out, that Gibbons was responsible for 51 patients, and that most other case managers

10   were responsible for about 30 - 34 patients.  The assignment sheet indicates that Allin was

11   in class from eight until noon.  The assignment sheet for October 21, indicates that four

12   case managers were out, that Gibbons was responsible for 41 patients, and most other

13   case managers were responsible for 30 - 34 patients.  Gibbons' ADO indicates that she

14   was unable to meet with Allin prior to 2:00 p.m., because Allin was in meetings.  The

15   assignment sheet for October 28, indicates that four case managers were out, including

16   Hooshmand, that Gibbons was responsible for 46 patients, and that most other case

17   managers were responsible for 30 - 34 patients.  The assignment sheet further indicates

18   that, on that date, Allin worked as a case manager.  On her ADO, Gibbons indicates that

19   she notified Allin that she was assigned 10 - 12 patients more than any other case

20   manager.

21   6)     On January 6, 2004, Gibbons (accompanied by Sheryl Bunch, her union

22   representative) met with Jim Clark, Vice-President of Human Resources, and Mullins.

23   Documentation of the meeting indicates that Gibbons was informed that complaints had

25   [20]     In her deposition, Gibbons also testified to completing an ADO for January

26   28, 2004, for the same reason.  In her opposition, however, she has not offered an ADO or
     an assignment sheet into evidence as evidence of her workload.

1  been received from three individuals; that one case manager complained of Gibbons' tone,

2  and felt Gibbons was pushing her to complain; that another case manager complained that

3  she felt as if Gibbons was trying to recruit her to Gibbons' side; and that an employee from

4  another department complained that Gibbons used an aggressive tone.  Gibbons was

5  verbally counseled to spend time at work doing her job.  The documentation indicates that,

6  during the meeting, Gibbons refuted the first two events, and did not recall the third.[21]

7          7)      In late January 2004, the Ethics and Compliance Office was investigating the

8  case management for kickbacks, an investigation of which Gibbons was aware.  On

9  January 28, Gibbons met with two representatives from a durable goods vendor in a back

10 office, with the door open.  On January 29 or 30, Mullins met with Gibbons regarding an

11 allegation Mullins had received that the meeting had occurred with the door closed.

12 Gibbons responded that the door was open during the meeting, and requested that Mullins

13 speak with the two vendor representatives and another Sunrise employee who was in the

14 office.  No action was taken against Gibbons.  The record lacks any evidence as to who

15 had made the allegation that Mullins' was investigating.

16         8)      In early February 2004, Minta Albitze (Vice President of Pediatrics) received a

17 phone call from an anonymous male.  The caller claimed to be an employee, complained

18 that he was tired of listening to Gibbons complain about Alexander, and stated that he no

19 longer wanted to work with Gibbons.  Albitze discussed the phone call with Gibbons, but no

20 action was taken against Gibbons based upon the caller's complaints.

21         In late February 2004, the office of Dee Hicks (Chief Nursing Officer) received a

22 phone message left by an anonymous male.  The caller claimed that Gibbons was

23 _____

24      [21]     In her opposition, Gibbons relies upon her deposition testimony as to her
        recollection of the underlying events leading to the meeting.  Material to the issue of
25      whether the meeting was retaliatory, however, is the motivation of Sunrise in investigating
        the two incidents, their investigation of the two incidents, and their subsequent conduct
26      arising from that investigation.  Gibbons has not offered any evidence as to any of these
        material issues.

unhelpful in treating his mother, and had bad-mouthed the hospital at the nurses' station.
Tim Egan (Director of Human Resources), Chris Taylor (Chief Financial Officer), Hicks, and
Mullins met with Gibbons and Bunch (the union representative) regarding the call.  No
investigation was conducted into either call, as Sunrise lacked any information to pursue.
No action was taken against Gibbons based upon the callers' complaints.[22]

Gibbons has no knowledge that Allin was involved in the making of either call, and
did not offer any evidence that Allin was involved in either call.

9)     On February 27, 2004, Allin gave Gibbons a "coaching" for protocol breach,
which coaching was placed into Gibbons' personnel file.  The coaching occurred in a
meeting attended by Egan, Mullins, Allin, and Bunch.[23]  The coaching recites that two
vendors had informed Allin that each wanted to register a complaint regarding Gibbons'
behavior and interactions, including Gibbons calling a vendor's place of employment to
complain.  The coaching further recites the recognition that issues can arise with a service
provider's representative, but that these incidents need to be reported to the Director to
provide the Director an opportunity to work with these individuals.  The coaching further
recites that, since a meeting on February 13, 2004, Gibbons had been effective in reporting
all concerns to Allin, resulting in a great improvement in communication and in resolution of
concerns and problems.

In her written feedback, Gibbons stated that she acted professionally toward
vendors, staff and patients, that she had notified her previous supervisor (Hooshmand) of

---

[22]     In his deposition, Egan testified that he "may have" had Albitze listen to the
message left in Hicks' office, and that it "sounded familiar" that Albitze stated that the caller
was the same man that had called Albitze to complain.

[23]     Gibbons acknowledges that she received a coaching, and testifies that the
coaching occurred in the presence of Egan.  She also offers Egan's deposition testimony in
response to query whether claims were substantiated: "Well, I remember – again, it's like
what now, two, three years?  I remember that subsequent to my communications with
them, I did not find cause for us to take any action against Molly, so I think that was pretty
much it."

1  events, and (according to Gibbons' recollection) the initial call to the vendor had occurred a

2  year previously.  Gibbons noted, in signing, that her "signature is to acknowledge that I

3  have read above [illegible] & completely disagree."

4          Gibbons has not offered any evidence into the record to indicate that the vendors

5  had not sought to register a complaint, or that Allin had prompted the vendors to file a

6  complaint.  Rather, conceded that she lacked any such knowledge, and offered only her

7  recollection of the events about which the vendors were complaining.

8          10)     After Allin made the decision to resign her employment at Sunrise, and

9  announced the decision to the Case Management Department, she approached Gibbons

10  and stated that she wanted to meet with her to discuss previous issues.  In response,

11  Gibbons filed a complaint that she feared retaliation.  Mullins investigated, substantiated

12  that Allin wanted to meet with Gibbons to discuss previous issues, but was unable to

13  substantiate that the purpose was retaliatory.  A decision was made to pay Allin out and

14  have her leave before the resignation date.

15          11)     Prior to Allin's last day at Sunrise, Gibbons regularly made copies of the

16  assignments in front of Allin.  On that date, the new director of case management, Ernie

17  Stegall, stopped Gibbons from making a copy of the assignments and instructed her to not

18  make copies.[24]  Gibbons complied with Stegall's instruction.

19          12)     Prior to her last day, Allin posted openings for three supervisor positions in

20  the Case Management Department.  Four individuals applied, including Gibbons.  Stegall

21  did the hiring for these positions.  Prior to her departure, Allin told Stegall that she didn't

22  think Gibbons was qualified to be a supervisor, that Gibbons didn't get along with other

23  pediatric case managers, and that she had given Gibbons a counseling.

24  _____

25  [24]      Gibbons offers the following testimony of Stengall, in response to a question
   whether Stengall had been instructed by Allin to tell Gibbons to not make copies of the
26  assignment sheet: "She may have told me that.  I don't know if she said Ernie, you need to
   tell her to stop doing that, or if I just went ahead and said no, please don't do that."

16

1      Prior to hiring for the positions, Stegall met with Wayne Salem, an executive in

2  finance, and "reviewed with him that [Stegall] didn't feel it was necessary to have three

3  supervisors because the department wasn't that large to have three supervisors and two

4  would suffice."  Salem agreed.  Stegall hired two supervisors.  He did not hire Gibbons.

5      Stegall did not consider Allin's comments about Gibbons in making the decision to

6  only hire two supervisors.  Allin's comments had influence in Stegall's decision to not hire

7  Gibbons.  He was also influenced by his interviews with the individuals.  Stegall also, as

8  was his practice, pulled Gibbons' personnel file and found that she had been coached

9  concerning an outside vendor, and noted that Gibbons had indicated her disagreement

10 with the coaching.

11     13)    In early March 2005, about one year after Allin ended her employment, and

12 about eighteen months after Gibbons lodged her complaint with Sunrise concerning Allin's

13 racial comments, Gibbons received a coaching from Stengall.

14     14)    After April 2005, more than one year after Allin ended her employment, and

15 about nineteen months after Gibbons lodged her complaint with Sunrise concerning Allin's

16 racial comments, and after Gibbons transferred from Case Management to Utilization

17 Review, Gibbons was told by a case manager that Nancy Keller had instructed the case

18 manager to inform Keller when Gibbons was on the floors, and to not speak with

19 Gibbons.[25]

20 Hostile Environment

21     Title VII provides that it is "an unlawful employment practice for an employer . . . to

22 discriminate against any individual with respect to his compensation, terms, conditions, or

23 privileges of employment, because of such individual's race."  42 U.S.C. §2000e-2(a)(1).

24 ——————————

25     [25]    In her deposition, Gibbons generally asserts that, after she transferred out of
Case Management, Stegall complained that Gibbons was telling case managers what to
26 do.  Gibbons does not identify to whom Stegall was complaining, or the basis of her
knowledge that Stegall was complaining.

1   Title VII guarantees "the right to work in an environment free from discriminatory

2   intimidation, ridicule, and insult."  *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65

3   (1986).  "To establish the prima face hostile work environment claim under . . . Title VII . . .

4   [the plaintiff] must raise a triable issue of fact as to whether (1) she was subjected to verbal

5   or physical misconduct because of her race, (2) the conduct was unwelcome, (3) the

6   conduct was sufficiently severe or pervasive to alter the conditions of [the plaintiff's]

7   employment and create an abusive work environment."  *Manatt v. Bank of America, NA,*

8   339 F.3d 792, 798 (9th Cir. 2003) (internal quotation marks and citations omitted).

9               **Whether Plaintiffs were Subjected to Misconduct Because of Their "Race"**

10          The defendants first argue that neither Hooshmand nor Gibbons can maintain a Title

11  VII claim because they cannot show that Allin made the inappropriate comments because

12  of their race.  The plaintiffs counter that Title VII protects Caucasians and prohibits

13  discrimination based upon an interracial relationship.

14          The defendants, in contending that the plaintiffs cannot show they were subject to

15  misconduct because of their race, raise several arguments relevant to whether the plaintiffs

16  can show that Allin's conduct was sufficiently severe as to alter the conditions of the

17  plaintiffs' employment.  Whether Allin's non-Caucasian slurs created a hostile work

18  environment for these plaintiffs is a distinct question from whether the animus for Allin's

19  utterances was the plaintiffs' race.  The court will limit its analysis of the first element to the

20  determination whether, and to what extent, the plaintiffs raised a triable issue that the

21  animus for Allin's misconduct was the plaintiffs' race.

22          The plaintiffs argue that the Sixth and Eleventh Circuits, and various district courts,

23  recognized Title VII claims for discrimination based upon an interracial relationship. The

24  Eleventh Circuit's opinion, *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892

25  (11th Cir. 1986) effectively captures the conclusion of these opinions: "[w]here a plaintiff

26  claims discrimination based upon an interracial marriage or association, he alleges, by

18

1    definition, that he has been discriminated against because of *his* race" (emphasis original).

2    These courts reason that, by definition, an interracial relationship is a relationship that

3    involves the race of each party to that relationship.  Thus, these courts conclude that

4    because the plaintiff is one of the parties to the relationship, the employer has necessarily

5    considered the plaintiff's race when it acts because of the interracial relationship.  As

6    indicated in the Sixth Circuit opinion, *Tetro v. Elliot Popham Pontiac, Oldsmobile, Buick,*

7    173 F.3d 988, 994-95 (6th Cir. 1999), the essence of a Title VII interracial relationship claim

8    is the contrast in races between the plaintiff and the other party to the relationship.

9           The Ninth Circuit has not resolved the issue whether a plaintiff may meet the first

10   element of the prima facie Title VII claim by showing that she was subject to misconduct

11   because of her interracial relationship.  Nevertheless, the court will, for purposes of this

12   motion, accept and apply the premise that Title VII prohibits discrimination against an

13   employee because of the employee's interracial marriage or relationship that produced a

14   bi-racial child.  The court will do so for several reasons.  First, as demonstrated in other

15   decisions, permitting a Title VII claim to go forward when the animus for the discrimination

16   was an "interracial relationship" furthers, rather than hinders, the underlying purpose of

17   Title VII.  Second, other courts have specifically permitted Title VII claims to go forward

18   when the interracial relationship is a marriage or a relationship producing a bi-racial child.

19   Third, in *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1118 (9th Cir. 2004), the Ninth

20   Circuit suggested, in *dicta*, that "[h]ostile conduct that attempts to sever or punish only

21   those friendships that are interracial might certainly 'pollute[] the victim's workplace . . ..'"

22          As this matter is before the court on the defendants' motion for summary judgment,

23   the burden is upon each of the plaintiffs to raise a triable issue of fact whether the animus

24   for Allin's misconduct was an interracial relationship.

25          Gibbons has met her burden of raising an issue of fact whether the animus for Allin's

26   "dark meat" comment was Gibbons' interracial relationship with her bi-racial son.  Allin

expressly referenced Gibbons' son in the context of, and in connection with, her "dark meat" comment to Gibbons.

Hooshmand has also met her burden of raising an issue of fact whether Allin's animus for using racial slurs to refer to Hooshmand's ex-husband was Hooshmand's prior interracial relationship with her ex-husband.  Hooshmand offered evidence that Allin, while talking with Hooshmand, identified Hooshmand's ex-husband both in the context of his former relationship to Hooshmand and in context of his race.  That is, the context of Allin's remarks raises an issue of fact whether a nexus exists between the racial slur and Hooshmand's interracial relationship, and thus an issue of fact whether Allin made the statement because of Hooshmand's race.

Neither plaintiff, however, has raised a triable issue of fact that Allin's animus for her verbal misconduct to other persons was "interracial relationships."  Gibbons has not offered any evidence that a consideration of interracial relationships involving a bi-racial son motivated Allin to state "and your [sic] black too" to Verna Stringer.  The record lacks any evidence that Stringer was involved in an interracial relationship involving a bi-racial son.  The evidence permits only an inference that Allin's animus for the statement was Stringer's race.

Similarly, Hooshmand has not offered evidence suggesting that consideration of "interracial marriage" motivated Allin to use certain racial slurs to refer to another employee.  While Allin used similar slurs to refer to Hooshmand's former husband, Hooshmand has not offered any evidence that the other employee was involved in an interracial marriage.  The record permits only an inference that Allin's animus for the racial epithets used to refer to the other employee was that employee's race.

Finally, Hooshmand also argues that Allin's animus for making the "Denise black, Denise white" remarks was Hooshmand's race, that is, "white."  Hooshmand has raised an issue of fact whether, on one occasion, Allin used the "Denise black, Denise white"

comment because of Hooshmand's race.  Specifically, Allin linked the comment with an explanation that Verna Stringer, an African-American, was assigned to ER because no one argues with a black woman.  The context of this statement permits an inference that Allin referred to Hooshmand as "Denise white" because of Hooshmand's race.  Hooshmand, however, has herself provided evidence that Allin's other uses of the comments were not because of race, but because of Hooshmand's personality and how she treated other persons.  As Hooshmand testified, she recognized Allin would comment that Hooshmand should be Denise black rather than Denise white to try to train Hooshmand to be like Allin. As Allin is Caucasian, Allin's use of the terms "black" and "white" could not have been motivated by either Hooshmand's or Allin's race.  Rather, black referred to certain personality traits that Allin believed she had and that Hooshmand should have, while "white" referred to personality traits Allin believed Hooshmand had but should abandon.[26]

### Whether the Misconduct Created A Hostile Environment

"Workplace conduct is not measured in isolation; instead, 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001).  The burden on each plaintiff is to raise an issue of fact whether their "workplace [was] permeated with discriminatory intimidation . . . that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Brook v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 1999) (citation omitted); *see also, Meritor,* 477 U.S. at 67.   Further, each plaintiff must show that the work environment was both subjectively and objectively abusive.  *Fuller v.*

---

[26]   Hooshmand testified, in her deposition, that Allin identified Hooshmand's traits as being too nice, and Allin's traits as being mean.

1   *City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (citation omitted).  "The Supreme Court

2   has followed a 'middle path' with regard to the level of hostility or abuse necessary to

3   establish a hostile work environment.  Simply causing an employee offense based on an

4   isolated comment is not sufficient to create actionable harassment under Title VII.

5   However, the harassment need not cause diagnosed psychological injury."  *McGinest*, 360

6   F.3d at 113.  In considering whether an environment is objectively hostile, "[t]he required

7   level of severity or seriousness varies inversely with the pervasiveness or frequency of the

8   conduct.'"  *Nichols v. Azteca Rest. Enter.,* 256 F.3d 864, 872 (9th Cir. 2001) (quoting *Ellison*

9   *v. Brady*, 924 F.2d 872, 878 (9th Cir.1991)).  Further, "[t]he 'objective severity of

10   harassment should be judged from the perspective of a reasonable person in the plaintiff's

11   position, considering all the circumstances.'"  *Id.,* quoting *Oncale v. Sundowner Offshore*

12   *Servs., Inc.*, 523 U.S. 75, 81-82 (1998)).

13       As to Gibbons, the record she has developed does not raise an issue of fact

14   whether Allin's misconduct was sufficiently severe and pervasive as to cause her workplace

15   to be abusive.  Initially, the court would note that the severity of Allin's conduct relative to

16   Gibbons must be judged from the perspective of a reasonable Caucasian with a bi-racial

17   son.  Allin directed a single comment to Gibbons expressly concerning this relationship.

18   Though offensive, this single utterance is not actionable in and of itself.  That is, the

19   utterance does not rise to the level of creating a hostile environment for Caucasians with bi-

20   racial children.  Allin also made two other comments in Gibbons' presence that concerned

21   African-Americans.  While a reasonable Caucasian involved in a relationship with an

22   African-American may be more sensitive to such remarks, and view such remarks with

23   greater offense, these statements in conjunction with the "dark meat" comment do not rise

24   to the level of creating a hostile environment.  Finally, Gibbons relies upon Allin's racial and

25   ethnic references to patients that she heard.  Though the number of these statements is

26   greater, their impact is less severe when judged from the perspective of a Caucasian in an

interracial relationship that involved none of these other races or countries of origin.[27] Considering all circumstances, including only a single statement made directly to Gibbons relative to her interracial relationship, only a few statements concerning the other race to that interracial relationship, and the several statements concerning other races and countries of origin, when judged from the perspective of a reasonable Caucasian in an interracial relationship, Gibbons has not raised an issue of fact that her workplace was objectively hostile.

Hooshmand presents a somewhat closer question.  The court would note that Hooshmand has presented evidence of a greater frequency of Allin's comments regarding persons of Middle Eastern race, which may raise an issue of fact whether the workplace, when judged from the perspective of a Caucasian formerly married to a man of Middle Eastern ancestry.  Nevertheless, though the remarks concerned Hooshmand's former husband, the severity was significantly diminished relative to the relationship itself.  That is, Hooshmand presented little evidence that the remarks were directed to the relationship.  Rather, the evidence indicated the remarks were directed at the ex-husband because of his race.  Thus, the severity must be judged from the perspective, and the sensibilities, of a former spouse, and a parent to the children of that relationship.  Hooshmand has also shown that Allin used similar racial slurs, in Hooshmand's presence, to refer to another employee of similar race.  Though Hooshmand also relies upon Allin's racial and national origin references to patients, the severity of such statements is diminished when considered from the perspective of a Caucasian previously married to a Middle Eastern male.

---

[27]      In her opposition, Gibbons relies extensively upon statements made in the presence of other persons.  The evidence further establishes that Gibbons was not aware of these statements when they were made, and became aware of them only after Gibbons notified Sunrise of her complaints.

1       Finally, Hooshmand's claim does not rely solely upon her status as a Caucasian

2   formerly married to a person of a different race, but also as a Caucasian who was told to

3   quit being Denise white, and to start acting like Denise black.  Most such comments were

4   not directly tied to race.  Hooshmand's own testimony indicates that the context of certain

5   uses of this phrase was not related to race, but to being nice and mean.  Allin did, however,

6   directly connect the phrase to race, stereotyping certain attributes to African-Americans.

7   Other than this phrase, Hooshmand did not offer any evidence that Allin engaged in any

8   other misconduct directed either at Hooshmand or at others because of Hooshmand's

9   race: Caucasian.

10      Overall, these circumstances present a close question whether the workplace was

11  hostile to Hooshmand.  Hooshmand has not shown that the workplace was hostile because

12  she was Caucasian.  Though the severity of Allin's racial slurs regarding Middle Eastern

13  races was offensive, none would suggest a hostile workplace standing alone.  While the

14  offensiveness of these statements would be more severe to a reasonable Caucasian

15  formerly married to a Middle Eastern man than to a Caucasian, their severity is not as great

16  as judged from the perspective of a Middle Eastern Man.  Conversely, Hooshmand testified

17  that such racial statements occurred between 7 and 15 times.  Though this frequency does

18  not suggest constant, daily use, it also does not suggest infrequent use.

19                **Faragher/Ellerth Affirmative Defense**

20      In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries,*

21  *Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court recognized an affirmative defense

22  for employers that (1) exercised reasonable care to prevent and correct promptly any

23  discriminatory behavior, and (2) the plaintiff unreasonably failed to take advantage of any

24  preventive or corrective opportunities provided by the employer or to otherwise avoid harm.

25  The plaintiffs do not dispute that Sunrise had in place, prior to Allin's employment, policies

26  prohibiting harassment and discrimination and procedures for complaining of misconduct.

1  The plaintiffs also do not dispute that they were instructed regarding these policies and
2  procedures.

3      Neither Gibbons or Hooshmand offers any evidence that they promptly complained
4  of Allin's misconduct.  Hooshmand testified that Allin first used the Denise black, Denise
5  white phrase within weeks of starting her employment.  Gibbons testified of hearing Allin's
6  racial comments regarding patients during the summer of 2003.  Nevertheless, Gibbons
7  first complained to Sunrise of Allin's conduct in late September, 2003.  Hooshmand
8  testifies that she first complained of Allin's "erratic behavior" in either late August or early
9  September, asserting that she "think[s] [she] shared with [Sturm] all of everything" including
10 Allin's racial comments to Hooshmand.  Sturm instructed Hooshmand "to write it down."
11 Hooshmand did not comply with that instruction until September 24.  In her deposition, she
12 testified that she was motivated on that date my Allin's behavior, but Hooshmand did not
13 identify any racially derogatory comment on that date that triggered her decision to follow
14 Sturm's instruction to write it down.  Indeed, the court would note the lack of any evidence
15 that Allin engaged in any racially offensive conduct subsequent to Hooshmand's first verbal
16 complaint to Sturm.

17     Once Hooshmand and Gibbons complained, Sunrise investigated the complaints.
18 The investigation substantiated complaints that Allin used racial slurs.  Sunrise considered
19 and contemplated a range of actions that could be taken against Allin, including her
20 dismissal.  At the conclusion of the investigation, but prior to a decision being made,
21 Sunrise instructed Allin to take several days off work while a decision was being made.
22 Upon Allin's return, Sunrise gave her a written discipline and warned her to not engage in
23 any retaliatory conduct.  Sunrise discussed the result of the investigation with the entire
24 department, and discussed the decision individually with both Hooshmand and Gibbons.
25 While the plaintiffs complained that they were not informed of the result of the investigation
26 prior to its announcement to the entire department, neither has presented evidence that

they complained that the punishment was inadequate at that time.  While both plaintiffs note that they were asked if they would be able to continue being supervised by Allin, and the record indicates that they were asked this question outside of Allin's presence, neither presents any evidence that they indicated they informed Sunrise that they could not continue to work with Allin.

Subsequent to the investigation and discipline, only Gibbons offers any evidence of a single, further racial incident involving Allin.  (Gibbons, however, does not offer any evidence that she complained of this incident.  She does offer evidence, however, that she filed written objections regarding her workload.)  This record indicates that the discipline of Allin was a reasonable and effective remedy to her behavior.  Accordingly, assuming that Hooshmand established that the workplace was hostile to her as a Caucasian and as a Caucasian formerly married to a Middle Eastern man, the defendants have met their burden of proof on the affirmative defense outlined in *Faragher* and *Ellerth*.  By contrast, the plaintiffs have not raised a triable issue of fact that the defendant's remedy was not reasonable and effective.

Retaliation

To maintain their retaliation claims, the plaintiffs must show that each engaged in a protected activity and then suffered a materially adverse employment action causally connected to the protected activity.  *Brooks*, 229 F.3d at 928.  To show that an employment action is materially adverse, the action must be such that it "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Rwy. Co. v. White*, 126 S.Ct. 2405, 2415 (2006).  Upon such a showing, the burden shifts to Sunrise to articulate a legitimate business reason for its action, which shifts back to the plaintiffs the burden to show that the explanation is pretext for retaliation.

The court assumes, for purposes of this motion, that Gibbons' and Hooshmand's complaint was protected activity, and will focus on whether either raised an issue of fact that they suffered a materially adverse employment action causally connected to their complaint.

Without dispute, Hooshmand decided to quit working for Sunrise shortly after she made her complaint.  Within that short time, Hooshmand alleges that she was "demoted" on October 1, when Allin "began putting her on the floor as a Case Manager."  The record indicates that, prior to October 1, Hooshmand was assigned to work as a case manager on certain units.  Her complaint regarding October 1 is that the units she was assigned to on that date differed from the units she was assigned to on previous dates.  Hooshmand has not offered any evidence that her assignments after October 1 were inconsistent with her assignments prior to October 1.  That is, the record she has developed indicates that she is complaining of her assignment on that one date.  Such a record does not permit an inference that Hooshmand's assignments on October 1 were such as to dissuade a reasonable worker from making or supporting a charge of discrimination.  The court would also note the lack of evidence causally connecting the assignments of October 1 to Hooshmand's complaint.  The record indicates that Allin generally did not make the assignments, but merely approved the assignments.  The record does not indicate any different practice occurred on October 1.  The record lacks any indication that the individuals that typically made the assignments had any knowledge that Hooshmand had filed a complaint.

Hooshmand further alleges that before she began working for Gentiva, Allin telephoned Gentiva, and that after Hooshmand began working for Gentiva, she was not permitted to continue working at Sunrise as a VSP.  While Hooshmand has offered evidence that she discussed a willingness to continue working as a VSP, she has not offered evidence that a VSP position was open.  Hooshmand has also not offered evidence

1  that Allin's phone call to Gentiva precluded Hooshmand from working for Gentiva, or that

2  Allin made any negative statement to Gentiva.  Hooshmand's complaints of other actions

3  plainly do not rise to the level of materially adverse.

4       Gibbons has recited a considerably greater number of incidents that she alleges are

5  retaliatory.  Gibbons complains of events occurring in 2005, one year after Allin no longer

6  worked for Sunrise.  The length of time between the complaint and the asserted adverse

7  actions is simply too great to permit any inference of a causal link between her protected

8  activity and these events.

9       Gibbons complains that, as retaliation, she received anonymous phone calls at

10  home.  Gibbons has not shown that these anonymous phone calls are attributable to

11  Sunrise, or connected to Gibbons' complaint.  Gibbons offers only her own speculation that

12  the calls were instigated by Allin.  The court will not speculate as to the perpetrator or

13  perpetrators of these calls, or the motive for the calls.

14       Gibbons complains that, as retaliation, Sunrise received anonymous phone calls

15  complaining about Gibbons.  Gibbons has not shown that Sunrise caused these calls to be

16  placed, and she has not shown she suffered a materially adverse employment action as

17  the result of anonymous phone calls made to Sunrise concerning Gibbons' workplace

18  conduct.  While Gibbons was made aware of these calls, no disciplinary action was taken

19  against her based upon the complaints of the callers.  The court would note the lack of any

20  evidence that the person placing the calls was aware of Gibbons' complaint, or that

21  person's actions could be attributed to the defendants.

22       Gibbons complains that, as retaliation, Allin was unwilling to talk with her on the

23  phone.  Allin's unwillingness to talk to Gibbons on the phone, and her efforts to avoid

24  talking with Gibbons, do not amount to a materially adverse employment action.

25       Gibbons complains that four of her assignments in October were retaliatory.  She

26  has neither shown that the assignments were materially adverse actions or that they were

Case 2:05-cv-00787-LDG-GWF   Document 87   Filed 08/19/08   Page 29 of 31

1  causally connected to her complaint.  On October 1, Gibbons was assigned to work with

2  Marilyn Alexander, when she would have preferred to work with Joyce Schifini.  On three

3  other dates that month, she was assigned units such that she was responsible for more

4  patients than any other case manager.  Gibbons does not offer any evidence that Allin's

5  involvement in the assignments on any of these dates was other than to approve the

6  assignment.  Gibbons does not offer any evidence as to who made the assignment, or offer

7  any evidence that the persons making the assignment had reason to retaliate.  The record

8  indicates that other case managers generally made the assignments, and that Allin then

9  approved assignments.  Gibbons has also failed to show that being assigned to work with

10  Alexander, rather than Schifini, amounts to a materially adverse assignment.

11       Gibbons complains that, as retaliation, she received several fewer assignments to

12  on-call days in either November or December.  The receipt of several fewer assignments to

13  on-call does not constitute a materially adverse employment action.

14       Gibbons complains, in her claim of retaliation, that an allegation was made against

15  her regarding an alleged closed door meeting with outside vendors.  Gibbons offers no

16  evidence as to who made the allegation.  Further, it is undisputed that Sunrise investigated

17  the allegation, including discussing the allegation with Gibson, who denied that the door

18  was closed, and indicated witnesses to that fact.  No action was taken against Gibbons as

19  a result of the anonymous allegation.

20       Gibbons complains that a verbal counseling she received in January 2004 was

21  retaliatory.  Gibbons has not disputed that Sunrise received three complaints from three

22  individuals regarding Gibbons' interactions with them.  While Gibbons disputes what

23  occurred in these interactions, the undisputed fact remains that the other parties to the

24  interactions perceived the interactions differently than Gibbons, and complained of

25  Gibbons' conduct.  Assuming that the verbal counseling is materially adverse, Gibbons has

26  not shown a causal connection between that counseling and her complaint.  The

1  allegations were first raised by co-employees to Allin.  Allin did not undertake any action,

2  but referred the complaints to appropriate parties for investigation.  Sunrise interviewed the

3  complaining parties, and issued the counseling based upon those interviews.

4       Gibbons complains that her verbal coaching for a protocol breach five months after

5  her complaint was retaliatory.  Gibbons has not shown that the coaching was causally

6  connected to her complaint against Allin.  The undisputed evidence is that Sunrise received

7  complaints from two different vendors regarding Gibbons' interactions with the vendors.

8  Gibbons has not shown that Allin or Sunrise initiated the complaints.  While Gibbons

9  disputes the nature of her interactions with the vendors, she does not dispute that the

10  complaints were made.

11       Gibbons complains, as retaliation, that Allin indicated a desire to talk with Gibbons

12  after Allin decided to resign her employment at Sunrise.  The discussion did not occur.

13  Rather, to ensure that retaliation did not occur, Sunrise advanced Allin's termination date,

14  and paid her for the remaining days.  Gibbons has not shown that the action was materially

15  adverse to her employment.

16       Gibbons complains that prior to Allin's last day at Sunrise, the new director of case

17  management, Ernie Stengall, stopped Gibbons from making a copy of the assignments and

18  instructed her to not make copies.  Gibbons complied with Stengall's instruction.  Gibbons

19  has not shown that Stengall's instruction was materially adverse to her employment.

20       Gibbons complains, as retaliation, that she was not promoted to supervisor after

21  Allin no longer worked for Sunrise.  Stegall testified that, in making his decision, he

22  considered his interviews with the applicants, their files (which indicated that Gibbons had

23  received a coaching), and Allin's statements to Stegall that she did not feel Gibbons should

24  be a supervisor.  Gibbons does not dispute, however, that Allin was not the final decision-

25  maker, and that Allin no longer worked for Sunrise when the decision was made.

26

1    In conclusion, the court finds that neither Gibbons nor Hooshmand has raised an

2  issue of fact that they were subject to retaliation for filing a complaint to Sunrise regarding

3  Allin's racial comments and slurs.  Rather, the evidence indicates that Sunrise was diligent

4  in ensuring that neither was subjected to retaliation.

5  State Law Claims

6    Both plaintiffs have abandoned their claims for intentional infliction of emotional

7  distress.  Summary judgment is appropriate as to the plaintiffs' remaining state law claims

8  for negligent infliction of emotional distress and for negligent training, supervision, and

9  retention.

10  Therefore, for good cause shown,

11    THE COURT **ORDERS** that defendants' Motions for Summary Judgment (## 45, 46)

12  are GRANTED.

13

14  DATED this _____ day of August, 2008.

15

16  _____
   Lloyd D. George
17  United States District Judge

18

19

20

21

22

23

24

25

26